UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LAMARCUS MORRIS** | **CIVIL ACTION** |
| **VERSUS** | |
| | **No. 07-05453** |
| **GULF COAST RAIL GROUP, INC. &** | |
| **CITY OF NEW ORLEANS BY AND** | |
| **THROUGH THE PUBLIC BELT** | |
| **RAILROAD COMMISSION OF THE** | **SECTION I** |
| **CITY OF NEW ORLEANS, d/b/a NEW** | |
| **ORLEANS PUBLIC BELT RAILROAD** | |

## ORDER

The defendants, New Orleans Public Belt Railroad ("NOPB") and Gulf Coast Rail Group ("Gulf Coast"), have filed a motion for partial summary judgment in the above captioned case.[1] The plaintiff, Lamarcus Morris ("Morris"), has opposed the motion.[2] For the following reasons, the motion is **GRANTED.**

### *BACKGROUND*

In June 2006, NOPB, owned and operated by the City of New Orleans, solicited bids from independent contractors to upgrade its Claiborne rail yard ("Claiborne project").[3] The

---

[1]R. Doc. No. 90. Although defendants style their motion as a motion for summary judgment, the motion does not address plaintiff's claims against Gulf Coast, as a third party tortfeasor, pursuant to LA. REV. STAT. art. 2315. Therefore, the Court will construe defendants' motion as a motion for partial summary judgment.

[2]R. Doc. No. 94.

[3]R. Doc. No. 90-9, pp. 4-7.

1

Claiborne project involved the removal and replacement of rail, railroad ties, and switches.[4] Gulf Coast, a company that performs track construction services for railroads, submitted a bid for the project and which was successful.[5] On July 7, 2006, Gulf Coast and NOPB entered into a contract entitled "Form of the Construction Contract of the Public Belt Railroad Commission, d/b/a New Orleans Public Belt Railroad."[6]

The contract describes Gulf Coast as an independent contractor, stating:

The Railroad reserves no control whatsoever over the employment, discharge, compensation of or services rendered by the Contractor's employees, and it is the intention of the parties to this agreement that the Contractor shall be and remain an independent contractor, and that nothing in this agreement contained shall be construed as inconsistent with that status.[7]

The contract stipulates that Gulf Coast "shall constantly superintend all of the work embraced in this contract, in person or by a duly authorized representative acceptable to the Railroad."[8] The contract provides for NOPB inspection of Gulf Coast's work as follows:

[A]ll work and material shall be at all times open to the inspection, acceptance or rejection of the Engineer or his authorized representative. The Contractor shall give the Engineer reasonable notice of starting any new work and shall provide reasonable and necessary facilities for inspection, even to the extend [sic] of taking out portions of finished work. . .[9]

In addition, the contract gives NOPB the right to request that Gulf Coast remove their employees

---

[4] R. Doc. No. 90-3, p. 2, ¶ 11.

[5] *Id.* at p. 1, ¶ 4.

[6] *Id.* at p. 2, ¶ 10; *id.* at pp. 4-14.

[7] *Id.* at p. 5.

[8] R. Doc. No. 90-3 p. 5.

[9] R. Doc. No. 94-2, p. 6.

from the job site in certain situations:

> If any person employed on the work shall refuse or neglect to obey the directions of Contractor, or his duly authorized agents, as to workmanship, character of the work or quality of the materials, or if he is so incompetent, disorderly or unfaithful as to interfere with the proper fulfillment of this contract, he shall, upon the request of Engineer, be at once discharged and not again employed on the work.[10]

In the fall of 2006, plaintiff traveled from his home in Altheimer, Arkansas to New Orleans, Louisiana to work for Gulf Coast on the Claiborne project.[11] Plaintiff received a paycheck from Lone Star Temporary Services, L.C. ("Lone Star").[12] According to Gulf Coast owner Mike Baker ("Baker"), it was Gulf Coast's regular business practice to supplement its workforce with temporary labor from Lone Star.[13] Plaintiff testified at his deposition that he was first hired by Gulf Coast superintendent Frank Bohannon ("Bohannon") in 2005 to work on a project for Gulf Coast in Presidio, Texas.[14] Plaintiff testified that he was not aware of Lone Star's involvement in his employment until he received his first paycheck from Lone Star.[15]

While working on the Claiborne project, plaintiff stayed in a hotel with Gulf Coast employees[16] and received a per diem from Gulf Coast.[17] Plaintiff and other Gulf Coast crew

---

[10]R. Doc. No. 94-2, p. 7

[11]R. Doc. No. 90-6, pp. 10, 36; R. Doc. No. 90-3, p. 2 ¶ 8.

[12]R. Doc. No. 90-6, p. 5.

[13]R. Doc. No. 90-3, p. 2 ¶ 7.

[14]*Id.* at pp. 16-17.

[15]*Id.* at p. 5.

[16]*Id.* at p. 16; R. Doc. No. 90-3, p. 2 ¶ 14.

[17]*Id.* at p. 34.

members rode in a Gulf Coast van every morning to the Claiborne project job site.[18]

On September 11, 2006, plaintiff and Gulf Coast superintendent, Frank Bohannon ("Bohannon"), were replacing cross ties in the Claiborne yard.[19] According to plaintiff, Bohannon instructed plaintiff to ride on the cross tie machine.[20] During this task, plaintiff's right middle finger was severed by a part of the cross tie machine.[21]

Plaintiff asserts claims against Gulf Coast, as a third party tortfeasor, pursuant to LA. REV. STAT. art. 2315 and against NOPB pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51, *et seq*. ("FELA").[22] Defendants contend in their motion for partial summary judgment that plaintiff's FELA claims against NOPB should be dismissed because NOPB was not plaintiff's employer within the meaning of FELA. In his opposition, plaintiff argues that he was an employee of NOPB under FELA at the time of his injury.

*LAW AND ANALYSIS*

**I.      STANDARDS OF LAW**

*A. Summary Judgment*

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment always bears the

---

[18]R. Doc. No. 90-6, p. 16; R. Doc. No. 90-3, p. 2 ¶ 14.

[19]R. Doc. No. 90-6, pp. 24-25.

[20]R. Doc. No. 28, p. 2; R. Doc. No. 90-6, p. 27.

[21]R. Doc. No. 28, p. 2; R. Doc. No. 90-6, pp. 26-27.

[22]With plaintiff's consent, the Court dismissed plaintiff's FELA claim against Gulf Coast on April 29, 2010. *See* R. Doc. No. 100.

initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex*, 477 U.S. at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party must carry this burden as to each essential element on which it bears the burden of proof. *Schaefer v. Gulf Coast Regional Blood Center*, 10 F.3d 327, 330 (5th Cir. 1994). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

**B. FELA**

5

FELA provides the exclusive remedy for employees of interstate railroads to recover from a railroad for injuries incurred during the course of their employment. *Rivera v. Union Pacific R. Co.*, 378 F.3d 502, 507 (5th Cir. 2004)(citing *Wabash R.R. Co. V. Hayes*, 234 U.S. 86, 89-90, 34 S.Ct. 729, 58 L.Ed. 1226 (1914)). FELA provides, in relevant part:

> Every common carrier by railroad engaging in commerce between any of several States . . . shall be liable in damages to any person suffering any injury while he is employed by such carrier in such commerce ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, [and] engines....

45 U.S.C. § 51. "[T]o prevail under [FELA], a plaintiff must prove that (1) the defendant is a common carrier by railroad engaged in interstate commerce; (2) [the plaintiff] was employed by the defendant with duties advancing such commerce; (3) his injuries were sustained while he was so employed; and (4) his injuries resulted from the defendant's negligence." *Weaver v. Missouri Pacific Railroad Co.,* 152 F.3d 427, 429 (5th Cir. 1998)(internal citations omitted).

**i. Employee of a Railroad**

In *Kelley v. S. Pac. Co.*, the United States Supreme Court explained that the terms "employee" and "employed" as used in FELA describe a conventional "master-servant" relationship, to be determined by reference to common law principles. 419 U.S. 318, 323, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974).[23] The Supreme Court explained in *Kelley*:

> Under common-law principles, there are basically three methods by which a plaintiff can establish his "employment" with a rail carrier for FELA purposes

---

[23]The existence of merely an agency relationship between plaintiff and plaintiff's direct employer and the railroad is not sufficient to create an employment relationship between the plaintiff and the railroad under FELA. *Kelley,* 419 U.S. at 325; *see also Dominics v. Illinois Central Railroad Co.*, 934 F. Supp. 223, 225-26 (S.D. Miss. 1996).

6

> even while he is nominally employed by another. First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. See Restatement (Second) of Agency § 227; *Linstead v. Chesapeake & Ohio R. Co.*, 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453 (1928). Second, he could be deemed to be acting for two masters simultaneously. *See* Restatement § 226; *Williams v. Pennsylvania R. Co.*, 203, 209 (2d Cir. 1963). Finally, he could be a subservant of a company that was in turn a servant of the railroad.

*Id.* at 324.

Plaintiff asserts a subservant theory of employment, i.e., that he was a subservant of Gulf Coast, which was in turn a servant of NOPB.[24] A servant is "'a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.'" *Id.* at 324 (quoting RESTATEMENT 2D OF AGENCY § 220(1)). The Fifth Circuit explained the subservant theory of employment in *Lindsey v. Louisville & Nashville R. Co.* as follows:

> [U]nder [FELA] a worker can be the employee of a railroad even though carried on the employment rolls of another company and paid by that other company. The test of employment is the established test in workers' compensation cases. It is whether the railroad has control of the employee or the right to control the employee. The law does not require that the railroad have full supervisory control. It requires only that the railroad, through its employees, plays "*a significant supervisory role*" as to the work of the injured employee.

*Lindsey v. Louisville & Nashville R. Co.*, 775 F.2d 1322, 1324 (5th Cir. 1985) (quoting *Kelley*, 419 U.S. at 327)(emphasis added).

The Third Circuit has similarly held that, "the primary factor to be considered in determining whether a plaintiff was employed by the defendant [under FELA] is whether the

---

[24]R. Doc. No. 94, p. 11. Plaintiff's counsel has informed the Court that plaintiff does not contend that he was a borrowed servant of the railroad, or that he was acting simultaneously for two masters. R. Doc. No. 112.

7

latter had the power to direct, control and supervise the plaintiff in the performance of his work at the time he was injured." *Williamson v. Consolidated Rail Corp*., 926 F.2d 1344, 1350 (3d Cir. 1991)(internal citations and quotations omitted). The *Williamson* court stated that factors relevant to this determination include: "who selected and engaged the plaintiff to do the work; who paid his wages for performing it; who had the power to terminate his employment; who furnished the tools with which his work was performed and the place of work." *Id*.

The mere fact that a railroad reserves the right to assure performance in accordance with the specifications of the contract does not render a contractor a railroad employee. *See Sullivan v. General Electric Company*, 226 F.2d 290, 291 (6th Cir. 1955). In *Chicago R.I. & P.R. Co. v. Bond*, the Supreme Court addressed the question of whether a particular worker was the employee of the railroad or whether he was an independent contractor. 240 U.S. 449, 36 S.Ct. 403, 60 L.Ed. 735 (1916). The Court found:

> There was, it is true, and necessarily, a certain direction to be given by the [railroad], or rather, we should say, information given to [the contractor]. But the manner of the work was under his control, to be done by him and those employed by him. He was responsible for its faithful performance and incurred the penalty of the instant termination of the contract for nonperformance. . . . The power given was one of control in a sense, but it was not a detailed control of the actions of [the contractor] or those of his employees. It was a judgment only over results and a necessary sanction of the obligations which he had incurred. It was not tantamount to the control of an employee . . .

*Id*. at 455-56. The Court concluded that the agreement between the railroad and the contractor was "not the engagement of a servant submitting to subordination and subject momentarily to superintendence, but of one capable of independent action, to be judged of by its results." *Id*. at 456.

Courts have distinguished the "authoritative direction and control" indicative of a master-

servant relationship from "mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." *Kelley*, 419 U.S. at 329 (internal citations omitted). The Supreme Court held in *Kelley* that "evidence of contacts between [the railroad's employees and the contractor's employees] may indicate, not direction or control, but rather the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation." *Id.* at 330. "The informal contacts between the two groups *must assume a supervisory character* before the [contractor's employees] can be deemed pro hac vice employees of the railroad." *Id.*(emphasis added).

**II. ANALYSIS**

Defendants argue that plaintiff was not an employee of NOPB under FELA because NOPB did not exercise supervisory authority over the work of Gulf Coast employees. Plaintiff argues that he has presented evidence sufficient to create a genuine issue of material fact as to whether the plaintiff was an employee of NOPB.

*A. Supervision of Plaintiff and Gulf Coast Employees*

The plaintiff's deposition testimony establishes that Gulf Coast, not NOPB, supervised him on a daily basis. Plaintiff testified at his deposition that Bohannon was the superintendent at the Claiborne yard,[25] that Bohannon was in charge of plaintiff,[26] and that plaintiff received his job duties from Bohannon.[27] Plaintiff testified that Bohannon determined how the job at NOPB was to be performed and that he "never saw nobody tell [Bohannon] 'no.' Whatever [Bohannon]

---

[25]R. Doc. No. 90-6, p. 13.

[26]*Id.*

[27]*Id.*

9

ordered us to do, it was do it his way."[28] Plaintiff also testified that Bohannon was supervising him at the time of his injury[29] and that he was complying with Bohannon's orders at the time of his injury.[30]

Deposition testimony by other Gulf Coast employees similarly suggests that NOPB did not play a significant supervisory role as to their work. David Gaddy ("Gaddy") testified that he received his work instructions from Bohannon,[31] that no one from NOPB supervised the Gulf Coast work crew,[32] and that no one from NOPB spoke to the Gulf Coast crew.[33] Richard Holder ("Holder") testified that Bohannon gave him his work assignments.[34] Willie Gene Johnson ("Johnson") testified that Bohannon supervised the Gulf Coast crew[35] and that Johnson received his orders from either Bohannon or Baker.[36] Johnson testified that Baker would instruct Bohannon and that Bohannon would, in turn, give the crew instructions.[37] Johnson testified that Bohannon was in charge of regulating safe procedures for the Gulf Coast crew[38] and that he

---

[28] R. Doc. No. 90-6, p. 27.

[29] R. Doc. No. 90-6, pp. 24, 27.

[30] R. Doc. No. 90-6, p. 27.

[31] R. Doc. No. 94-9, p. 16.

[32] R. Doc. No. 94-9, p. 12.

[33] *Id.*

[34] R. Doc. No. 90-10, p. 3.

[35] R. Doc. No. 94-11, p. 16-17.

[36] R. Doc. No. 94-11, p. 20.

[37] R. Doc. No. 94-11, p. 20.

[38] R. Doc. No. 94-11, p. 16.

conducted daily safety meetings,[39] which NOPB employees did not attend.[40] Johnson testified that NOPB employees did not instruct him on how to perform his job.[41]

In addition, Baker stated in an affidavit that for the entire duration of the Claiborne project, the plaintiff was supervised by Bohannon,[42] that Bohannon received his instructions from Baker,[43] and that Bohannon and Baker "maintained control over the manner in which the work was performed."[44] Baker further stated in the affidavit, "For the entire duration of the job at NOPB, no NOPB employee instructed me on the manner in which the work was to be performed."[45] The foregoing evidence suggests that NOPB did not play a significant supervisory role over the work of plaintiff or other Gulf Coast employees.

Plaintiff argues that additional testimony by Gulf Coast and NOPB employees shows that NOPB did exercise supervisory control over Gulf Coast employees. Plaintiff cites testimony by Johnson that his understanding of the relationship between Gulf Coast and NOPB was that "[NOPB] was supplying the work and we were there to, you know, do what whatever they needed us to do."[46] When asked what the term "chief engineer" would mean to him, Johnson

---

[39]R. Doc. No. 94-11, p. 16.

[40]*Id.*

[41]R. Doc. No. 94-11, p. 31.

[42]R. Doc. No. 90-3, p. 2 ¶ 15.

[43]R. Doc. No. 90-3, p. 2 ¶ 16.

[44]R. Doc. No. 90-3, p. 2 ¶ 17.

[45]R. Doc. No. 90-3, p. 2 ¶ 18.

[46]R. Doc. No. 94-11, p. 23.

testified that the chief engineer of NOPB is "over the whole – over everything."[47]

Johnson's subjective understanding of the relationship between Gulf Coast and NOPB is insufficient to defeat this motion for summary judgment. The Court observes that Johnson testified that he never saw the contract between Gulf Coast and NOPB and that Johnson agreed that he could not comment on what was in the contract.[48] The fact that Johnson described the chief engineer as being "over everything" does not show that the NOPB chief engineer supervised Gulf Coast employees, especially in light of his testimony to the contrary, discussed above.

Plaintiff also identifies Johnson's response to several questions asked at his deposition as indicative of NOPB's control. When asked if it was Johnson's understanding that NOPB "had control over their track and the yard and the work that you were doing in that area," Johnson answered, "Yes."[49] In response to the question, "From your understanding, could [NOPB] supervisors, if they were out there, could they monitor your work, could they have you re-do the work on their track?" Johnson answered, "Yes." The Court observes that as the owner of the track and yard, NOPB has control over such. Moreover, Johnson's testimony suggests that NOPB retained "a judgment only over the results and a necessary sanction of the obligations which [Gulf Coast] incurred," rather than "a detailed control" of the actions of Gulf Coast and its employees. *Bond 240 U.S. at 456*. Johnson's answers do not provide factual support for

---

[47]R. Doc. No. 94-11, p. 26.

[48]R. Doc. No. 94-11, p. 30.

[49]R. Doc. No. 94-11, p. 24.

plaintiff's assertion that NOPB controlled the work of Gulf Coast employees.[50]

Additional testimony relied on by plaintiff does not establish NOPB control over Gulf Coast employees. Plaintiff cites testimony by Gaddy that Gulf Coast employees "would have to do what [NOPB employees] tell us to do, but it would still have to go through [Bohannon] first"[51] and testimony by Johnson that any instructions from NOPB would be relayed to Baker or Bohannon, who would give the instruction to the Gulf Coast workers.[52] Johnson also testified that NOPB could order Gulf Coast employees to stop the work, but that, "then [NOPB] would have to go through Mr. Bohannon and Mr. Baker, you know, and then they would resolve it, you know whether we're going to go back to work or whatever."[53] In fact, these statements show that Gulf Coast, not NOPB, provided instruction and supervision to Gulf Coast employees.

Plaintiff cites testimony by Johnson that NOPB roadmaster Ray Lubrano was out at the Gulf Coast job site every morning and testimony by NOPB Chief Engineer Anthony Marinello ("Marinello") that NOPB agents made daily rounds and "touched base with [Gulf Coast]" to share "common information and business talk to keep the project moving and to look and see what [Gulf Coast] did."[54] Plaintiff argues that this testimony shows that NOPB supervised and controlled Gulf Coast's work.

The fact that NOPB agents were present at the Claiborne project site and "touched base"

---

[50]R. Doc. No. 94-11, p. 31.

[51]R. Doc. No. 94-7, p. 44.

[52]R. Doc. No. 94-11, p. 26.

[53]R. Doc. No. 94-11, p. 25.

[54]R. Doc. No. 94, p. 16; R. Doc. No. 94-6, p. 9.

13

with Gulf Coast supervisors to share information and observe Gulf Coast's progress does not establish that NOPB supervised Gulf Coast. This type of communication and direction is best characterized as "the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation," rather than direct supervision by NOPB. *Kelley* 419 U.S. at 330. Such interaction is not indicative of a master-servant relationship. *Id.*

## B. The Contract Between Gulf Coast and NOPB

Plaintiff contends that the contract between Gulf Coast and NOPB gave NOPB the right to control and direct the manner in which track repair was performed on its tracks and that the contract establishes that Gulf Coast was the servant of NOPB, rather than an independent contractor. The Court observes that the contract specifically states that Gulf Coast is an "independent contractor" and that "it is the intention of the parties to this agreement that the Contractor shall be and remain an independent contractor and that nothing in this agreement contained shall be construed as inconsistent with that status."[55] In addition, the contract states that NOPB "reserves no control whatsoever over the employment, discharge, compensation of or services rendered by [Gulf Coast's] employees."[56] The contract requires that Gulf Coast "constantly superintend all of the work embraced in this contract, in person or by a duly authorized representative acceptable to the railroad."[57] Similar language has been upheld by courts as being indicative of an independent contractor relationship, rather than a master-servant relationship. *See Bond*, 240 U.S. at 456.

---

[55]R. Doc. No. 94-2, p. 2.

[56]R. Doc. No. 90-3, p. 4.

[57]R. Doc. No. 94-2, pp. 5-6.

14

Plaintiff identifies several paragraphs of the contract in support of its argument that the contract provided for NOPB's direct control and supervision of the Claiborne project. First, plaintiff argues that the requirement that Gulf Coast superintend the work of its employees, "in person or by a duly authorized representative acceptable to the railroad"[58] shows that NOPB "clearly maintained control over discharging and replacing Gulf Coast's superintendents if they were not acceptable or became unacceptable."[59] However, this passage does not give NOPB the authority to discharge or replace a Gulf Coast supervisor. Nor does it give NOPB the right to control the manner in which Gulf Coast supervisors execute the performance required under the contract.

Plaintiff contends two passages, one allowing for dispute resolution by the NOPB chief engineer and the other providing for NOPB inspection of Gulf Coast's work, also show that NOPB retained control of Gulf Coast workers. The provisions state:

> All questions or controversies which may arise between the Contractor and the Railroad, under or in reference to this contract, shall be subject to the decision of the Chief Engineer, and his decision shall be final and conclusive on both parties. . . .
>
> [A]ll work and material shall be at all times open to the inspection, acceptance or rejection of the Engineer or his authorized representative. The Contractor shall give the Engineer reasonable notice of starting any new work and shall provide reasonable and necessary facilities for inspection, even to the extend [sic] of taking out portions of finished work. . .[60]

Again, these provisions do not give NOPB the right to supervise Gulf Coast employees. They

---

[58]R. Doc. No. 94-2, pp. 5-6.

[59]R. Doc. No. 94, p. 8.

[60]R. Doc. No. 94-2, p. 6.

merely provide for the cooperation necessary to allow Gulf Coast to perform its contract with NOPB. In addition, the mere fact that the railroad reserved the right to assure performance in accordance with the specifications of the contract does not render a contractor a railroad employee. *Sullivan*, 226 F.2d at 291.

Lastly, plaintiff argues that the contract gives NOPB the right to discharge Gulf Coast workers, as follows:

> If any person employed on the work shall refuse or neglect to obey the directions of Contractor, or his duly authorized agents, as to workmanship, character of the work or quality of the materials, or if he is so incompetent, disorderly or unfaithful as to interfere with the proper fulfillment of this contract, he shall, upon the request of Engineer, be at once discharged and not again employed on the work.

The Court observes that the contract states that NOPB may only request that an employee be discharged when the employee fails to obey Gulf Coast directions or when his actions "interfere with the proper fulfillment of this contract." NOPB chief engineer, Anthony Marinello ("Marinello"), testified at his deposition that he could not directly fire a Gulf Coast employee "because he's not my employee." Marinello said that he could request that a person be removed from the project.[61] Marinello elaborated that, "there have been times, not on this project per se, when I have seen abusive language and what not taking place, and I would ask the contractor, 'I'd like you to get rid of that person and I don't want him on my job anymore.'" Marinello testified that, after making such request, "[n]ormally, they would not be on the job the next day."[62]

---

[61] R. Doc. No. 94-6, p. 10.

[62] R. Doc. No. 94-6, p. 10.

16

The Court finds that the provision does not grant NOPB the unrestrained right to fire a Gulf Coast employee. It does not grant NOPB the right to supervise or direct Gulf Coast's employees.

The contractual provisions identified by plaintiff do not create a genuine issue of material fact as to whether plaintiff was an employee of NOPB. Despite plaintiff's arguments to the contrary, the Court finds that the agreement between NOPB and Gulf Coast is similar to that described in *Bond*, in which "the railroad company . . . did not retain the right to direct the manner in which the business should be done . . . in other words [the railroad] did not retain control not only of what should be done, but how it should be done." 240 U.S. at 456.

*C. Williamson Factors*

In addition, the Court finds that the factors that the Third Circuit identified in *Williamson* as being relevant to whether the railroad controlled the work of the plaintiff suggest that a master-servant relationship did not exist between NOPB and Gulf Coast employees. As for the first factor, i.e., who selected and engaged the plaintiff to do the work, plaintiff alleges that Gulf Coast hired the plaintiff.[63] By contrast, Baker states in an affidavit that plaintiff "was obtained from [Lone Star] to work as a laborer on Gulf Coast work crews."[64] Regardless, there is no evidence that NOPB selected and engaged plaintiff for the project.

As for the second factor, i.e., who paid the plaintiff's wages, the plaintiff testified that

---

[63]R. Doc. No. 90-6, pp. 16-17.

[64]R. Doc. No. 90-3, p. 2.

Lone Star, rather than NOPB or Gulf Coast, paid his wages.[65] Neither of these factors suggests that NOPB exercised control over plaintiff.

With respect to the third factor, i.e., who had the power to terminate his employment, it is clear that Gulf Coast had the power to terminate his employment. However, plaintiff argues that the contract between NOPB and Gulf Coast also gave NOPB the power to terminate Gulf Coast employees' employment. As discussed above, this provision did not give NOPB the right to terminate plaintiff's employment with Gulf Coast, it merely gives NOPB the right to request that he be removed from the NOPB project. This factor does not weigh in favor of an employment relationship between plaintiff and NOPB.

Finally, as for the last factor, i.e., who furnished the tools with which his work was performed and the place of work, NOPB asserts, and Gulf Coast does not dispute, that Gulf Coast provided the tools for plaintiff's work and that NOPB provided the place of work.[66] Although NOPB provided the place of work, this is only one factor and not determinative. Having conisdered the foregoing factors, the Court finds that they do not suggest that NOPB had the right or power to control the work of plaintiff.

---

[65] The Court observes that defendants concede that a master-servant relationship existed between Gulf Coast and plaintiff. R. Doc. No. 90-2, p. 15.

[66] Deposition testimony supports NOPB's assertions that Gulf Coast provided the tools and materials for the job. For example, Bohannon testified at his deposition that the cross ties being used by Gulf Coast were purchased by Gulf Coast and shipped to the job site. R. Doc. No. 90-7, p. 6. Plaintiff testified at his deposition and Baker stated in his affidavit that the cross tie inserter machine upon which plaintiff was injured was provided by Gulf Coast and transported to the job site in New Orleans by Gulf Coast. R. Doc. No. 90-6, p. 34; R. Doc. No. 90-3, p. 2.

### D. *The Work of the Railroad*

Plaintiff also asserts that "Gulf Coast carried out the work of the railroad as NOPB's alter ego" because it conducted track maintenance and repair for NOPB. Plaintiff argues that NOPB had its own track maintenance and repair department and that Gulf Coast was performing "the work of the railroad for the railroad." In support of this argument, Morris relies on *Ancelet v. National Railroad Passenger Corp*., 913 F. Supp. 968 (E.D. La. 1995)(Vance, J.), in which the district court held that a pest control service technician was not an employee of the railroad.[67] In reaching its holding, the *Ancelet* court found significant the fact that "Ancelet performed specialized services for NRPC in an operation that had to be coordinated with the railroad's regular activities." *Id.* at 973. Plaintiff argues that *Ancelet* provides a relevant contrast and that because plaintiff was performing "the work of the railroad," NOPB exercised control over the work of Gulf Coast's employees.

However, courts have held that, "One primarily employed by another cannot be considered an employee of the railroad merely because the activity in which the individual is engaged in at the time of an injury is such that it might be characterized as work traditionally performed by railroads." *Cicacco v. New Orleans Public Belt Railroad Commission*, 290 F. Supp. 197, 200 (E.D. La.1968)(citing *Hetman v. Fruit Growers Express Co.*, 346 F.2d 947 (3d. Cir. 1965)).[68] In *Kelley*, the Supreme Court rejected the district court's reliance on the fact that a

---

[67]R. Doc. No. 94, p. 13.

[68]The Third Circuit held in *Hetman* that, "one who is employed by an independent contractor is not an 'employee' of, or 'employed' by, a 'common carrier by railroad' merely because the activity in which he is engaged at the time of his injury is such that it could be characterized as an integral part of the railroad's business. . . " 346 F.2d at 951-52.

19

contractor performed work that was "a non-delegable duty" of the railroad, pursuant to the railroad's contract with shipping companies. 419 U.S. at 326, n.7. The *Kelley* Court held that the fact that the contractor performed such work did not alter the contractor's relationship with the railroad because "the railroad was free to either use its own employees to [perform the work] or to subcontract the work to another company." *Id*.

As in *Kelley* and *Cicacco*, NOPB was free to contract with another company to perform track maintenance and repair work. The fact that the nature of the work performed by Gulf Coast may be traditionally described as railroad work does not establish an employment relationship between plaintiff and NOPB.

## *CONCLUSION*

Plaintiff has not identified evidence sufficient to create a genuine issue of material fact wither respect to whether plaintiff was an employee of NOPB. Accordingly, a grant of partial summary judgement as to plaintiff's claims against NOPB is warranted.

**IT IS ORDERED** that defendants' motion for partial summary judgement is **GRANTED** and that plaintiff's claims against NOPB are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, May 6, 2010.

     **LANCE M. AFRICK**
     **UNITED STATES DISTRICT JUDGE**